IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STORM V. CORNUTT


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


LORY D. STORM, APPELLEE,

V.

DAVID CORNUTT, APPELLANT.


Filed June 9, 2026.    No. A-25-212.


Appeal from the District Court for Scotts Bluff County: LEO P. DOBROVOLNY, Judge. Affirmed.

Adam R. Little, of Nebraska Legal Group, for appellant.

No appearance for appellee.


MOORE, PIRTLE, and FREEMAN, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

This is an appeal from an order of the Scotts Bluff County district court, which modified the duration of David Cornutt's spousal support obligation, denied him credit against his spousal support obligation, and failed to divide the parties' tax liabilities. The order arose out of a complaint filed by Cornutt's former wife, Lory D. Storm, seeking to vacate the parties' decree of dissolution based on fraud or, alternatively, seeking a declaratory judgment regarding federal tax liens attached to property awarded to her in the decree. Cornutt filed an answer asserting various affirmative defenses and a subsequent pleading seeking various credits against his spousal support obligation. Storm filed a counterclaim seeking a modification of Cornutt's spousal support obligation. Based on the reasons that follow, we affirm.

- 1 -

## II. BACKGROUND

### 1. PROCEDURAL HISTORY

The district court entered a dissolution decree in March 2020, approving the parties' stipulation and agreement as to spousal support and property division. Storm was represented by counsel for the divorce, but Cornutt did not have representation. The decree provided that Cornutt would pay Storm spousal support in the amount of $7,500 per month for 60 months.

Storm was awarded the parties' property in Steamboat, Colorado, and Cornutt was to sign a quitclaim deed for the property within 30 days of the decree being filed but remain an obligor on the mortgage until the property was remodeled and/or sold for a period of up to 3 years. Storm was to be responsible for paying the mortgage, insurance, property tax, and utility payments associated with the Colorado property.

Storm was also awarded property in Crawford, Nebraska, referred to as the Crawford ranch, and all equipment and horses thereon. Cornutt was to sign a quitclaim deed to Storm within 30 days of the decree being entered, but was to continue making the mortgage payments, property tax payments, and insurance payments for 5 years, unless the property was sold prior to those 5 years. Storm was ordered to pay the utilities. She was to refinance the property within 5 years, if not sold prior to that time lapsing.

Cornutt was awarded property in Scottsbluff, Nebraska, and was to be responsible for all payments related to the property. Storm was to sign a quitclaim deed within 30 days of the decree being filed.

Storm was to be responsible for the line of credit with Platte Valley Bank in the amount of $40,000 and the Platte Valley credit card with a balance of $11,000.

In October 2021, Storm filed a complaint alleging that in March, she had entered into an agreement to sell the Colorado property but prior to the sale closing she discovered the property was encumbered by federal tax liens against one or both of the parties. Storm believed the tax liabilities underlying the filing of tax liens by the Internal Revenue Service (IRS) were a result of Cornutt's intentional underpayment or nonpayment of federal income taxes for the tax years 2008 through 2011, as well as additional tax liabilities for the tax years 2012 through 2017. The complaint sought to have the court either vacate the decree due to fraud or enter a declaratory judgment determining that the federal tax liens were debts incurred during the marriage by Cornutt, without Storm's knowledge, and which must be paid and satisfied by Cornutt such that the liens may be withdrawn and dismissed from all real estate awarded to Storm.

Cornutt filed an answer to Storm's complaint denying the allegations and alleging affirmative defenses. He alleged Storm's claims were barred by the doctrine of latches, statute of frauds, estoppel and/or waiver, and he alleged the relief sought was barred by the doctrine of unclean hands.

In July 2023, Cornutt filed a "Petition to Satisfy Judgment, to Credit Spousal Support Obligation, and to Waive Interest." He sought credit in the amount of $68,714.11 toward his spousal support for payments he made on obligations Storm was ordered to pay in the decree.

Storm filed an answer, denying Cornutt was entitled to relief, and counterclaimed for an increase in the duration and amount of spousal support, arguing that there had been a material change in circumstances based on the tax liens discovered on the Colorado property.

Trial was held in May and June 2024.

## 2. EVIDENCE AT TRIAL

Although each party was ordered to sign quitclaim deeds in favor of the party awarded the respective property within 30 days of the decree, neither party complied with this requirement. Cornutt signed a quitclaim deed for the Colorado property in April 2021, just after the tax liens attached to the property in March. At the time of trial, Storm had not signed a quitclaim deed for the Scottsbluff property that was awarded to Cornutt.

Storm testified that during the divorce proceedings, her attorney did not conduct any discovery to determine what assets existed. Cornutt also testified that he was never served any discovery requests or had his deposition taken. Storm later filed a malpractice claim against her divorce attorney. At the time of trial, there was a pending settlement that Storm anticipated accepting to resolve the malpractice claim. The settlement amount was sealed based on a nondisclosure agreement as part of the settlement. However, the court was aware of and the record reflects that the settlement amount was $137,000.

### (a) Work History

Storm had her own real estate business where she bought houses, remodeled them, and resold them. At the time of the divorce, Storm had four properties in Colorado as part of her real estate business. After the divorce she remodeled and sold three of the four properties and invested that money into remodeling the fourth house, which is the Colorado property at issue. She testified that Cornutt knew it was her intent to sell the Colorado property she received in the divorce, as that was the intent when they bought it.

Storm testified that because of the tax liens she cannot sell the Colorado property and she has been unable to continue in her real estate business. She testified that to help support herself, she had worked as a bartender. She also got an independent wholesale dealer's license in March 2023 to buy and sell cars.

Storm testified that she cannot work a full time job due to problems with her knees and because she travels between three states taking care of the property she owns. She admitted that her physical ailments did not prevent her from getting a desk job, and she had not applied for disability for her knee issues.

Cornutt is a physician and at the time of the divorce he was the regional emergency director at Regional West Medical Center in Scottsbluff. He testified he was terminated from the director position effective January 1, 2024, due to restructuring of the company. At the time of trial he continued to be employed with Regional West as a staff physician in the emergency department. He earned a total of $443,899 in 2023, $220,000 resulting from the regional emergency director position. Accordingly, in 2024, his income decreased by $220,000, due to the loss of the director's position.

Cornutt was 65 years old at the time of trial and nearing the end of his career as an emergency department physician. He testified he was at the upper end of the age range for his field and did not know any other emergency department physicians older than he was.

(b) Tax Liability

The tax liens at issue are attached to four properties--the Colorado property, the Crawford ranch, the Scottsbluff property, and an Arizona property. The parties bought the Arizona property in April 2020, shortly after the divorce. Cornutt had been and continued to pay the mortgage on the Arizona property. The tax liens arose from unpaid taxes, penalties, and interest for tax years 2008 through 2017. Cornutt testified that the tax liabilities are based on his income during that time frame. Storm acknowledged that the tax liability associated with the liens accumulated during the marriage. The parties' decree did not assign any unpaid tax debts to either party.

Storm testified that she first learned of the tax liens in the spring 2021, when she was trying to sell the Colorado property awarded to her in the decree. She discovered there was a joint tax lien filed against both parties for 2008 and a second lien filed against Cornutt for subsequent years. The parties had filed a joint tax return for 2008, and the tax returns from 2009 to 2017 were filed married filing separately. Storm testified that between 2008 and 2020, she was not required to file personal income tax returns because of her limited income.

When Storm became aware of the tax liens, she hired a tax attorney to work with the IRS to discharge her responsibility for the liens so she could go through with the sale of the Colorado property. As part of that process, Storm intended to satisfy the 2008 joint lien of $175,000. Storm's tax attorney's negotiations with the IRS were unsuccessful. Storm testified that because of the tax liens she was unable to sell the property and the buyer had threatened a lawsuit against her for specific performance.

Storm claimed at the time the parties entered into the property settlement agreement she knew there was a "tax issue" as far back as 2010. She testified that in 2013 or 2014, Cornutt began working with Brian Huebsch, a tax attorney, and Cornutt told her that Huebsch was negotiating with the IRS and he was confident the amount owed in taxes would be less than $200,000. She stated that from 2015 to 2019, she and Cornutt had discussions about the tax debt and the ongoing litigation with the IRS and he indicated he would take care of all the back taxes owed.

Storm testified she did not discuss back-owed tax debt with her attorney at the time of the divorce because she did not think it was an issue. She assumed Cornutt had taken care of it. Storm later admitted that at the time of the divorce, she knew Cornutt could possibly have tax debt.

Cornutt testified that the parties first discussed their income tax liabilities in 2014. He stated that Huebsch suggested the parties get divorced to reduce the significant tax liabilities. While the parties did not divorce at that time, these discussions continued over the next several years, leading up to the divorce in 2020. Cornutt stated that in 2016 or 2017, Storm was getting ready to close on a house she was selling and was worried about tax liens being filed at that time. Further, Huebsch testified that when the parties began divorce proceedings in 2019, they both had discussions with him about a "strategic divorce" to shelter some of the assets from tax liability.

Huebsch testified that for the past several years he had been working with Cornutt on an "Offer in Compromise" (OIC) with the IRS to resolve the outstanding tax liabilities, penalties, and interest. The entire tax liability was between $1.5 million and $2 million. Cornutt's OIC offered $122,000 to settle the entire tax liability. The OIC was rejected because the IRS believed Cornutt could pay the full obligation within 10 years, based on his income at that time. The process had

since been remanded back to an appeals officer based on Cornutt's new financial circumstances, specifically the loss of the regional emergency director's role.

Cornutt testified that the tax liability was accumulated during the marriage and, therefore, he was asking the court to divide the liability equally.

Storm's tax attorney testified that if a quitclaim deed had been filed within 30 days of the decree, as was required, Storm would have been able to sell the Colorado property and this case would not exist. Instead, the quitclaim deed was filed after the tax liens were filed, thereby attaching Cornutt's tax liens to the property.

### (c) Cornutt's Payments on Storm's Obligations

On the first day of trial, the parties entered a stipulation regarding some of the payments Cornutt had made on Storm's obligations. They agreed that Cornutt paid $5,089.25 toward utilities on the Colorado property and paid $68,714.11 to the bank toward the mortgage on the same property. There was only an agreement as to the amounts Cornutt had paid; there was no agreement on whether these amounts should be credited toward Cornutt's spousal support.

In August 2021, Storm told Cornutt she could not make the mortgage payments on the Colorado property due to financial circumstances and she asked him to make the payments. Cornutt testified he elected to make the payments to maintain his integrity with the bank and to protect his credit score. Again, the undisputed payments made directly to the bank totaled $68,714.11.

At some point Cornutt stopped making the mortgage payments to the bank and started making them through the clerk of the court because he wanted credit toward his spousal support obligation. Cornutt testified it was never his intent that these mortgage payments were gratuitous; the payments remained Storm's legal obligation. He testified it was his understanding and intent that the payments he made on the Colorado mortgage would be credited against the spousal support obligation that remained. Cornutt made mortgage payments on the Colorado property through the court totaling $36,984.70, and he asked the court to credit his spousal support for this amount.

The last mortgage payment Cornutt paid on the Colorado property was in December 2023, after learning he had lost his position as regional emergency director. He informed Storm that he was no longer making the payments and she made one payment after that before the mortgage started falling in arrears. Cornutt subsequently made an arrangement with the bank where it agreed to defer foreclosing the Colorado property for a few months if he paid $3,500 in back owed insurance and taxes, which he did.

Cornutt testified about other financial obligations he had paid on Storm's behalf. As previously mentioned, the parties stipulated Cornutt had paid $5,089.25 for utilities on the Colorado property since the decree was entered, even though it was Storm's obligation. Cornutt asked the court to give him credit against his spousal support in that amount.

Cornutt further testified that he made payments on debts associated with the Crawford ranch, which were Storm's obligation under the decree, such as feed for horses and a loan for a mini excavator used on the ranch. In addition, Cornutt testified that when the parties' adult son expressed an interest in working with Storm in the real estate business, Storm asked him to cosign a loan for $200,000 so she and their son could buy a house to fix up and resell. Storm told Cornutt she would pay the loan off when the house sold. However, when the house sold, Storm kept the

proceeds and did not pay off the loan. At the time of trial, Cornutt was making monthly payments of $1,600 toward that loan.

Storm was ordered to pay the Platte Valley Bank credit card as part of the divorce decree and she agreed that Cornutt paid the balance of $13,897.26 for her. When Cornutt asked Storm to reimburse him, she told him she would only do so if he agreed to pay for her attorney. On rebuttal, however, Storm testified that she paid off the Platte Valley Bank credit card bill in July 2020 in the amount of $14,447.32.

### 3. TRIAL COURT'S FINDINGS

Following trial, the court stated it did not find fraud due to nondisclosure. It found that both parties were aware prior to the settlement agreement and decree that there were unresolved tax issues with several tax returns and it would not be considered a surprise that liens would eventually be filed if the tax issues were not resolved.

The court found it had no authority to cause the withdrawal of the IRS liens through a declaratory judgment because the taxing authorities had not been joined as parties. It found, however, that the tax liens filed against property awarded to Storm in the decree created an inequitable situation because the liens limited her ability to fully utilize the properties. The district court stated it did not matter whether or not Storm first became aware of the tax liens when she tried to sell the Colorado property because the liens were an encumbrance in addition to what existed at the time of the decree.

The court also noted that the outcome of the tax problems was not known. It stated the evidence did not show any likelihood of a settlement with the IRS, or for any particular amount, that would allow it to conclude the IRS liens would be satisfied within any certain amount of time.

The court further stated that the IRS was in control of the situation, as there was nothing the court could do in this case to affect the IRS liens. It stated, "[t]he only thing [it] can do is attempt to make the situation as equitable to [Storm] as possible considering the [ongoing] encumbrance to her property." The court ordered that Cornutt's monthly alimony obligation of $7,500 was extended to 90 months, or until further order of the court.

The court found it had sufficient evidence to allocate the tax lien for 2008 because it was a joint lien. The court ordered the tax liability, penalties, and interest applicable to 2008 be allocated equally between the parties. However, for tax years 2009 through 2017, the tax liens were filed against Cornutt only. The court allocated all penalties and interest from those years to Cornutt. It determined the evidence was not sufficient for the court to go any farther because there was little evidence about how the income that resulted in the tax liability was used during the marriage.

Finally, the court denied Cornutt's request for credit for other payments he had made that were not ordered in the decree. The court found he made those payments voluntarily, and keeping the mortgage current on the Colorado property was beneficial to his credit rating as well as to Storm's.

Following the court's order, Cornutt filed a motion to alter or amend, or alternatively a motion for new trial, which the court overruled.

### III. ASSIGNMENTS OF ERROR

Cornutt assigns that (1) the district court erred as a matter of law by modifying alimony as an equitable remedy, (2) the district court abused its discretion by modifying alimony as an equitable remedy, (3) the district court's alimony award is an abuse of discretion in both the amount and duration, (4) the district court abused its discretion by failing to credit non-gratuitous payments made by Cornutt on Storm's behalf, and (5) the district court abused its discretion by failing to equitably divide the tax liabilities.

### IV. STANDARD OF REVIEW

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and will be affirmed absent an abuse of discretion by the trial court. *Parish v. Parish*, 314 Neb. 370, 991 N.W.2d 1 (2023). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

### V. ANALYSIS

#### 1. MODIFICATION OF SPOUSAL SUPPORT

Cornutt's first three assignments of error relate to the court's modification of alimony, or spousal support, and we address them together.

#### (a) Good Cause to Justify Spousal Support Modification

Cornutt first argues that the district court's modification of spousal support was an abuse of discretion because there was no good cause to support the modification.

Where the parties have not expressly precluded or limited modification of alimony pursuant to Neb. Rev. Stat. § 42-366(7) (Reissue 2016), an alimony provision that was agreed to by the parties as part of a property settlement agreement may later be modified in accordance with Neb. Rev. Stat. § 42-365 (Reissue 2016). See *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020). Under § 42-365, alimony may be modified for good cause shown, and "good cause" means a material and substantial change in circumstances and depends upon the circumstances of each case. *Grothen v. Grothen, supra.*

Any changes in circumstances which were within the contemplation of the parties at the time of the decree, or that were accomplished by the mere passage of time, do not justify a change or modification of an alimony order. See *Mackiewicz v. Mackiewicz*, 313 Neb. 281, 984 N.W.2d 253 (2023). The moving party has the burden of demonstrating a material and substantial change in circumstances which would justify the modification of an alimony award. *Id*. To determine whether there has been a material and substantial change in circumstances warranting modification of a divorce decree, a trial court should compare the financial circumstances of the parties at the time of the divorce decree, or last modification of the decree, with their circumstances at the time the modification at issue was sought. *Id*.

In the court's order, it stated the tax liens were an encumbrance in addition to what existed at the time of the decree. And in overruling Cornutt's motion to alter or amend/motion for new trial, the court clarified that the liens attaching to the property was a material change that justified the modification of alimony. Cornutt argues the court erred in finding the tax liens were "good

cause," or a material and substantial change in circumstances, to warrant a modification of spousal support.

Cornutt argues there was no good cause to justify a modification of spousal support for two reasons. First, he asserts Storm knew about the tax debt during the marriage and could have anticipated tax liens would be filed against the property. Second, he claims the court ignored Storm's failure to exercise due diligence and the alleged malpractice of her divorce attorney.

As to his first argument, Cornutt claims that Storm could have anticipated the tax liens because she was aware of ongoing tax debts during the later years of marriage. For instance, Storm testified that at the time the parties entered into the property settlement agreement, she knew there was a "tax issue" as far back as 2010. She testified that in 2013 or 2014, Cornutt told her Huebsch was negotiating with the IRS and he was confident the amount owed in taxes would be less than $200,000. Storm also testified that from 2015 to 2019, she and Cornutt had discussions about the tax debt and the ongoing litigation with the IRS and he indicated he would take care of all the back taxes owed. Cornutt contends, therefore, the attachment of the liens was within the contemplation of the parties at the time of the divorce and is not a material change in circumstances; the tax liens were merely a result of the passage of time and not a new unanticipated event.

Although there was evidence that Storm was aware of tax debt during the marriage, as the district court found, the liens were an encumbrance in addition to what existed at the time of the decree. At the time of the divorce, Storm believed that Cornutt was taking care of the tax debt and she was not aware that the debt would later become a lien on the Colorado property. Storm was awarded the Colorado property in the divorce, with no tax liens attached. She testified Cornutt knew she intended to sell the property after the divorce. The tax liens now prevent her from selling the property, which also limits her income, as she is unable to use the proceeds from the sale of the Colorado property to invest in another property to remodel and sell. There was no indication as to when the tax issues would be resolved or the tax liens removed.

Second, Cornutt contends the court erred in finding there was good cause to modify spousal support because it ignored Storm's failure to exercise due diligence and the alleged malpractice of her divorce attorney. Cornutt admits that had he signed quitclaim deeds before the tax liens attached in March 2021, the liens likely would not have attached to the properties awarded to Storm in the decree. He argues, however, that Storm bears at least partial responsibility for the failure to obtain quitclaim deeds prior to the liens attaching. He claims that because he was not represented by counsel during the divorce proceedings, he told Storm that her attorney should prepare the quitclaim deeds, which were not done. Cornutt claims, therefore, that Storm's own inaction or the inaction of her attorney, which led to the malpractice claim, was the reason Storm did not have quitclaim deeds before the tax liens attached.

Regardless of what actions or inactions were taken by the parties regarding the quitclaim deeds, the fact remains that the tax liens did not exist at the time the decree was entered. We conclude the district court did not abuse its discretion in finding that the tax liens filed in March 2021 were a material change that occurred after the decree to support a modification of spousal support.

(b) Duration of Spousal Support

Cornutt next argues that even if there was good cause to modify spousal support, extending the $7,500 per month for an additional 30 months was an abuse of discretion. He claims the court disregarded the significant change in his financial circumstances that directly affected his ability to pay additional spousal support. Cornutt's position as regional emergency director was eliminated on January 1, 2024, resulting in a significant decrease in his annual income. Further, Cornutt was 65 years old at the time of trial and nearing the end of his career as an emergency department physician.

In addition, Cornutt claims the additional 30 months of spousal support was unreasonable because of the financial obligations he had paid on Storm's behalf. He paid $68,174.11 to the bank toward the mortgage on the Colorado property that was Storm's obligation and paid another $36,984.70 in mortgage payments through the court. He also paid $5,089.25 in utility bills on the Colorado property that Storm was obligated to pay, $13,897.26 on the Platte Valley Bank credit card, and the debt associated with a mini excavator located on the Crawford ranch. Storm also asked Cornutt to co-sign a loan for $200,000 so she and their son could buy and resell a house. When the house sold, Storm kept the proceeds and did not pay off the loan, leaving Cornutt to pay it.

Cornutt also claims that the modification of spousal support results in Storm being unjustly enriched because, in addition to the extra 30 months of spousal support, she still has the Colorado property and the Crawford ranch that were awarded in the decree. He contends that after the tax liens are satisfied, she can sell the property and retain the proceeds. He also claims she will receive a significant sum of money from the malpractice claim against her divorce attorney.

Regarding the duration of an alimony award, the primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). Above all else, the duration of an alimony award must be reasonable. *Id.*

We do not find Cornutt's arguments to be persuasive. Storm testified that the spousal support the parties agreed to at the time of the divorce was based on her plan to remodel and sell one of the properties she was awarded, allowing her to then buy another house and have funds to remodel it. She testified that Cornutt knew that was her intent. Storm further testified she would not have agreed to the property settlement, including the award of spousal support, had she known she would not be able to sell the property.

Further, as previously stated, there is no way to know when the tax debt will be satisfied and the liens released. The liens not only impact Storm's ability to sell the Colorado property, but they also affect the operation of her real estate business. Further, the malpractice action is separate from the present action and although there was evidence of a specific amount Storm may receive in a settlement, that settlement had not been finalized.

We determine that the district court did not abuse its discretion in extending the duration of spousal support from 60 months to 90 months. All Cornutt's assignments of error regarding spousal support fail.

## 2. FAILURE TO GIVE CORNUTT CREDIT AGAINST SPOUSAL SUPPORT OBLIGATION

Cornutt next assigns the district court abused its discretion by failing to give him credit for the payments he made on Storm's obligations per the decree. He argues the payments were not made gratuitously and it is inequitable to not give him credit against his spousal support obligation. The district court denied his request for credit, finding that he made those payments voluntarily and that he benefited by keeping the mortgage on the Colorado property current.

As previously set forth, Cornutt paid for various obligations that Storm was ordered to pay under the decree. Cornutt argues that the court should have given him credit toward his spousal support obligation in the amount of $164,413.68, the total of the payments he made toward Storm's court-ordered obligations. He argues that Storm benefited from Cornutt making these payments, and by not giving him credit toward the spousal support, Storm is receiving a "double recovery."

Based on the record before us, Cornutt made the payments toward Storm's obligations voluntarily. Although he may have believed he was going to get credit against his spousal support obligation, there was never any agreement between the parties to this effect. Further, the decree did not require Storm to repay Cornutt for any voluntary payments he made toward Storm's obligations, nor did it provide that Cornutt would be given any credit toward spousal support or otherwise. This assignment of error fails.

## 3. FAILURE TO DIVIDE TAX LIABILITIES

Finally, Cornutt assigns that the district court abused its discretion by failing to divide the tax liabilities. The court allocated the tax liability for the 2008 tax year because it was a joint lien. However, for tax years 2009 through 2017, the tax liens were filed against Cornutt only and the court determined it could not allocate the tax liability for those years because there was little evidence about how the income which resulted in the tax liability was used during the marriage. It further stated that how income was used is a significant factor and there was a lack of evidence on the matter.

Income tax liability incurred during the marriage is one of the accepted costs of producing marital income, and thus income tax liability should generally be treated as a marital debt. See *Meints v. Meints*, 258 Neb. 1017, 608 N.W.2d 564 (2000). Even if the taxes are overdue, the principle behind the rule is the same, and the underlying tax liability should ordinarily be a marital debt. *Id.* Equity may not demand the same result if credible evidence establishes that the delinquent tax-paying spouse spent significant funds on nonmarital pursuits. See *id.* Based on the same equitable principle, however, an innocent spouse who has filed separate tax returns, and paid his or her taxes in a timely fashion, should not be forced to share in any statutory penalties for the late filings of a dilatory spouse. See *id.*

Cornutt argues the tax liability is a marital debt and there was ample evidence to support the equitable division of the tax liabilities from 2009 to 2017. He argues his income was used for marital purposes and there is nothing in the record to suggest otherwise. He contends that the court's statement that there was little evidence as to how Cornutt's income was used during the marriage is inconsistent with the record.

Storm testified that Cornutt was the primary income earner during the marriage and that she benefited from his income. She testified that Cornutt's income was used to buy the Crawford ranch and other properties. Cornutt also testified he was the primary income earner during the

marriage and he and Storm lived off his income. He testified that they used his income to make improvements to the Crawford ranch and to purchase three properties in Colorado, including the property awarded to Storm in the decree.

Despite the testimony from both parties that Cornutt was the primary income earner during the marriage and that Storm benefited from his income, there was little evidence as to how the income which resulted in the tax liability was used during the marriage. In other words, the evidence did not show whether the income was used on marital or nonmarital pursuits. Cornutt's assignment of error fails.

## VI. CONCLUSION

We conclude the district court did not err in modifying the duration of Cornutt's spousal support obligations, in denying him credit against his spousal support obligation, and in failing to divide the parties tax liabilities.

AFFIRMED.